**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-1406 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THOMAS DART, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Moore lost his job as a Cook County Department of Corrections Officer. He was fired after the Cook County Sheriff's Merit Board found that he had engaged in conduct unbecoming of an officer. But Moore believes that he was fired for his free expression.

The problem began when Moore injected himself in a criminal case about the murder of another officer from the Cook County Sheriff's Office. Moore attended the court hearings, and wore clothing that displayed colorful messages in the courtroom. He also represented that he was the decedent's partner, which got him a front row seat and special access to private meetings with the victim's family and the prosecutor about the future direction of the case. Moore voiced disagreement with the plea deal.

Moore's involvement sparked a few problems. Moore's courtroom attire did not go over well. And in the view of the Sheriff's Office, Moore responded unprofessionally when he received pushback about his wardrobe. Also, the family of the victim came to learn that Moore wasn't the decedent's partner at all, which made them feel violated and betrayed.

The Sheriff's Office sought to terminate Moore based on his involvement in the criminal case about the murder of the officer. After an evidentiary hearing before the Merit Board, Moore lost his job.

Moore believes that the Merit Board terminated him in retaliation for exercising his First Amendment rights. So he filed suit against Sheriff Dart, the Merit Board, and Cook County, bringing a First Amendment retaliation claim and a handful of state law claims.

The First Amendment claim is largely about Moore's role in the criminal case. But the complaint raises another situation, too. Moore believes that the Merit Board terminated him for raising questions and speaking his mind about the conduct of Sheriff Tom Dart. Moore spoke up about the possibility that Sheriff Dart had engaged in domestic violence. As Moore sees it, the Merit Board fired him for asking too many questions.

Defendants moved to dismiss. By the look of things, Defendants want this Court to declare, at the motion-to-dismiss stage, that the Merit Board correctly terminated Moore for violating the policies of the department.

For the reasons stated below, the motion to dismiss is denied.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *See Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The story begins with a tragedy that struck a decade ago. Off-duty Officer Cuauhtemoc Estrada, a Cook County Sheriff's Office Investigator, was at a Veterans of Foreign Wars hall for a family Christmas party.

Outside the party, Officer Estrada spotted two people trying to rob his daughter and her boyfriend at gunpoint in the parking lot. Officer Estrada reached for his gun. The robbers fatally shot him in the chest.[1]

The police arrested the alleged assailants, and charges soon followed. Plaintiff Michael Moore – a Cook County Department of Corrections Officer at the time – closely followed the criminal court proceedings.

Really closely. Moore was "allowed to sit with Estrada's [] family members in the court room, specifically in the jury box." *See* Cplt., at ¶ 1 (Dckt. No. 1). Moore could sit there because "he represented that Estrada was his 'partner,' i.e., his friend and colleague." *Id.* at ¶ 2; *see also id.* at ¶ 26.

"In support of Estrada," Moore "wore his badge around his neck and a motorcycle vest with the fictional 'Sons of Anarchy' patch on the back." *Id.* at ¶ 3. Sons of Anarchy, it seems, is a fictional motorcycle gang from a TV show.

Not everyone has time for television, so the average reader may or may not have found the time to catch the show. Wikipedia describes Sons of Anarchy as a "crime drama television series" that ran from 2008 to 2014. *See Sons of Anarchy*, Wikipedia, https://en.wikipedia.org/wiki/Sons_of_Anarchy (last accessed Jan. 31, 2024).

---

[1] *See, e.g.*, *Off-Duty Sheriff's Officer Cuauhtemoc Estrada Dies in Shooting Outside VFW Hall in Bellwood*, ABC7 Chi. (Dec. 21, 2013), https://abc7chicago.com/archive/9368547/ (last accessed Jan. 31, 2024); Nick Swedberg, *Man Convicted in Murder of Off-Duty Cook County Sheriff's Officer Who Was Shot Defending Family*, Chi. Trib. (Jan. 23, 2018, 9:50 PM), https://www.chicagotribune.com/news/breaking/ct-met-bellwood-murder-trial-20180123-story.html (last accessed Jan. 31, 2024).

Sons of Anarchy "follows the lives of a close-knit outlaw motorcycle club operating in Charming, a fictional town in California's Central Valley." *Id.* So it's a charming show about anarchists from Charming.

"Themes throughout the show include love, brotherhood, loyalty, betrayal and redemption. It explored vigilantism, government corruption and racism. The show's plot depicted an outlaw motorcycle club as an analogy for human transformation." *Id.*; *see also Sons of Anarchy*, FX, https://www.fxnetworks.com/shows/sons-of-anarchy (last accessed Jan. 31, 2024) (describing Sons of Anarchy as "an adrenalized drama that explores a notorious outlaw motorcycle club's . . . desire to protect its livelihood while ensuring that their simple, sheltered town of Charming, California remains exactly that, charming").

The Hollywood Reporter calls it "thrilling chaos and mayhem." *See* Tim Goodman, *Review: 'Sons Of Anarchy' Season 4.*, Hollywood Reporter (Sept. 6, 2011, 9:08 p.m.), https://www.hollywoodreporter.com/tv/tv-news/review-sons-anarchy-season-4-231858/ (last accessed Jan. 31, 2024).

If you had to make a list of words that you want to associate with a courtroom, "Anarchy" wouldn't be at the top of the list. Anarchy doesn't play well with order in the court.

The complaint does not give much information about the Sons of Anarchy patch, except to say that it appeared on the back of Moore's vest. But the complaint did attach the decision of the Merit Review Board as an exhibit. *See* Merit Board Decision (Dckt. No. 1, at 24 of 30). And that decision provided some colorful details.

"Respondent [Moore] wore his CCSO badge on a chain around his neck, while also wearing a motorcycle vest with a fictional 'Sons of Anarchy' patch on the back over a sleeveless shirt. The patch included a depiction of the Grim Reaper holding an AR-15-style rifle." *Id.*

At this early stage, this Court cannot hazard a guess about what, if anything, Moore was trying to communicate by wearing that outfit. Maybe that vest is Moore's everyday apparel. Or maybe he picked it to communicate something. Suffice it to say that the Grim Reaper, with an AR-15 in hand, made an appearance in the jury box during the criminal case.

A picture of the patch isn't in the record, so any interested reader will need to stay tuned and wait for the judicial sequel. But the internet offers easy-to-find examples. They show an emaciated Grim Reaper with a pointy black hat and tattered clothing, holding an orb with a large red "A" in his long, bony fingers. In his other hand, skull-face holds what looks like a combination of an AR-15 and a scythe, a handy all-in-one weapon that appears to do double duty. The presence of dripping red liquid suggests that the weapon was recently pressed into service, successfully.

At some point, an Assistant State's Attorney told Moore that he was not allowed to wear the vest. *See* Cplt., at ¶ 4 (Dckt. No. 1). Moore responded that the court could not infringe his First Amendment rights. *Id.* at ¶ 5.

The next day, Moore made a wardrobe change and wore a different vest in the courtroom. *Id.* at ¶ 6. The new vest "had a law enforcement theme to show [Moore's] support of the fallen [O]fficer Estrada." *Id.* But the ASA told Moore that he could not wear it, either. *Id.* at ¶ 7. According to the ASA, Moore expressed his thanks for the prohibition, albeit in a round-about way: "f*ck you very much." *Id.*

By representing that he was the decedent's partner, Moore gained special access to intimate meetings about the trial. Specifically, Moore attended a meeting with the ASA and the victim's family. *Id.* at ¶ 8. During the meeting, Moore criticized a potential plea deal. *Id.*

Moore "voiced his disagreement and personal opinion of the ASA['s] settlement explanation." *Id.* at ¶ 9.

Moore also voiced his dismay to others. Moore "told a room of police officers that the assailants were being offered less than the maximum sentence." *Id.* at ¶ 10. And he "wrote letters to State's Attorney Anita Alvarez's office, the Illinois Attorney and Disciplinary Committee, and the Cook County Sheriff complaining about what he observed." *Id.* at ¶ 11.

Moore upped the ante, voicing his disagreement to the highest levels of local government. He "sent letters to Chief Judge Timothy Evans and the new State's Attorney, Kim Foxx[,] complaining and voicing his disagreement with the potential settlement terms." *Id.* at ¶ 12.

On September 29, 2016, the Sheriff's Office of Professional Review received allegations that Moore's conduct was unbecoming of a correctional officer. *Id.* at ¶¶ 13, 36. Moore "was accused of acting unprofessionally during CCSO Investigator Cuauhtemoc Estrada's court hearings while off duty." *Id.* at ¶ 37.

The Sheriff's Office opened an investigation into Moore's conduct during the criminal case. And in the meantime, another front emerged in the field of friction between Moore and the Cook County Sheriff's Office.

In September 2017, about a year after the Sheriff's Office of Professional Review received the allegations about the criminal case, Moore became interested in an issue involving the Sheriff himself. Moore grew suspicious that Cook County Sheriff Tom Dart had "engaged in a domestic battery at his home." *Id.* at ¶ 39. He formed that belief after reading a former blog about Sheriff Dart entitled "Crook County Sheriff," and after hearing other information. *Id.*

6

Moore thought a "cover-up of the allegations was occurring because no official investigation was being visibly conducted at the time." *Id.* at ¶ 41. So, Moore tried to get to the bottom of it.

In October 2017, Moore "reported to the Chicago Police Department a failure on the part of the police department to take action." *Id.* at ¶ 42. He "reported injuries to Sheriff Dart's wife based on information provided by other officers" in Moore's "social circles." *Id.* at ¶ 43. He also sent a Freedom of Information Act request to the Sheriff's Office "regarding incidents, police calls, [] police activity, and records in connection with Sheriff Dart's home." *Id.* at ¶ 48.

Moore's outreach to the Chicago Police Department apparently got things moving. The Chicago Police Department started an investigation, and Moore spoke to the investigators about "two separate instances of possible domestic violence calls," including "wrongdoing" and "corruption" by officers who originally investigated the domestic battery. *Id.* at ¶¶ 46–47; *see also id.* at ¶¶ 44–45.

Later, in July 2018, the Office of Professional Review pursued "multiple investigations," and at least one of them found Moore "guilty of violating" Sheriff's Office policies. *Id.* at ¶ 51.

In response, in February 2019, the Sheriff filed a complaint with the Merit Board, seeking to discipline Moore for his conduct during the Estrada criminal case. *Id.* at ¶ 52.

The Sheriff alleged that Moore had falsely portrayed himself as Officer Estrada's partner and close friend, which allowed him to participate in sensitive meetings about the direction of the case. *See* Merit Board Decision (Dckt. No. 1, at 24–25 of 30). The Sheriff also alleged that Moore wore inappropriate attire in the courtroom, and "acted in a physically threatening manner" to the ASA when he raised the issue. *Id.* at 25. Finally, the allegations covered the letters that Moore wrote complaining about the state court judge and the ASA. *Id.*

7

By the look of things, the Sheriff did not raise, and the Merit Board did not address, Moore's communications about alleged domestic battery by Sheriff Dart.

The parties had counsel, and they participated in discovery. The Merit Board held a hearing on four separate days, spread over the span of a year and a half from February 2020 to October 2021. *Id.*

After hearing the evidence, the Merit Board made a number of findings of fact. According to the Board, the state court judge made the call that Moore "could not wear his motorcycle vest while sitting in the jury box," and the ASA was simply the messenger. *Id.* at 26–27. Even more, when Officer Estrada's family found out that Moore was *not* his partner, "they became very uncomfortable and violated" because Moore "was invading their personal space where very intimate discussions took place." *Id.* at 28.

The Merit Board found by a preponderance of the evidence that Moore had violated various policies of the Sheriff's Department. The "Conclusion" portion of the decision points to Moore's false representation of himself as the decedent's partner.

"Respondent [Moore] did violate these rules by falsely portraying himself as the partner of Inv. Estrada which led to [ASA] Groth including him in discussions of the prosecution and court proceedings and resulted in [ASA] Groth misleading Judge Daleo, the judge in the case. Judge Daleo allowed Respondent to sit in the jury box because of this belie[f]. Inv. Estrada's family was flabbergasted, surprised and felt betrayed when they found out Respondent was not his partner." *Id.* at 29.

In the end, the Merit Board ordered Moore's termination. *Id.*; *see also* Cplt., at ¶ 53 (Dckt. No. 1).

Moore responded to the termination by filing this lawsuit. He sued Sheriff Dart in his individual and official capacities. He also sued the Cook County Sheriff's Merit Board,[2] and Cook County as an indemnitor. *See* Cplt., at ¶¶ 23–25 (Dckt. No. 1). The complaint has seven counts.

Count I is a First Amendment claim. Moore alleges that Defendants violated his right to free speech when they fired him for "publicly displaying patches and police paraphernalia on his clothing in the courtroom, writing letters regarding his concerns about how the Estrada case was being both prosecuted and presided over, publicly discussing his concerns with the settlement offered with other police, [] other forms of verbal protest while off duty, and seeking FOIA information on matters of public interest." *Id.* at ¶ 57.

The rest of the counts are state law claims. Count II is an indemnification claim. *Id.* at ¶¶ 61–62. Count III is a breach of contract claim, alleging that Sheriff Dart violated a collective bargaining agreement. *Id.* at ¶¶ 63–78. Count IV is a "complaint for administrative review of Merit Board's decision." *Id.* at ¶¶ 79–87. The remaining counts involve the Illinois Whistleblower Act. *Id.* at ¶¶ 88–141.

Defendants moved to dismiss the complaint for failure to state a claim. *See* Mtn. to Dismiss (Dckt. No. 27).

---

[2] The complaint takes it as a given that the Merit Board is a juridical entity, meaning that it is suable. Other courts have addressed the status of the Merit Board. *See Bless v. Cook Cnty. Sheriff's Off.*, 2016 WL 958554, at *5 (N.D. Ill. 2016) ("At times the Merit Board has even denied that it is a suable separate legal entity (though it does not do so in this case)."); *Tate v. Cook Cnty. Sheriff's Merit Bd.*, 2007 WL 2962785, at *1–*2 (N.D. Ill. 2007); *see also* 55 ILCS 5/3–7002 ("There is created the Cook County Sheriff's Merit Board, hereinafter called the Board, consisting of not less than 3 and not more than 7 members appointed by the Sheriff with the advice and consent of three-fifths of the county board."). This Court does not weigh-in, one way or the other, on whether Moore can sue the Merit Board itself. Defendants do not raise it, so the Court will not reach it.

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

**Analysis**

The motion to dismiss is about the First Amendment claim, the only federal claim in the case. As Defendants see it, the First Amendment claim is driving the jurisdictional train. So once the First Amendment claim is derailed, the rest of the case should fall off the tracks, too. *See* Defs.' Mem., at 1 (Dckt. No. 28).

To bring a First Amendment retaliation claim, Moore must plead facts alleging that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and (3) the speech was a motivating factor in his employer's adverse employment action. *See Fehlman v. Mankowski*, 74 F.4th 872, 875 (7th Cir. 2023).

The motion to dismiss does not raise any arguments about the second or third elements. Defendants do not argue that the complaint fails to allege that Moore suffered a deprivation, or

that the speech was a motivating factor for the termination. The only exception is an argument that appeared for the first time in the reply brief, which doesn't count.

Instead, the motion to dismiss focuses on the first element (only), meaning whether Moore engaged in constitutionally protected speech. That question, in turn, requires the Court to roll out another legal test.

Remember, Moore was a public employee. Public employees have more limited free speech rights than private employees, given their association with the government. The First Amendment protects the speech of a public employee if "(1) he spoke as a private citizen rather than in his capacity as a public employee; (2) he spoke on a matter of public concern; and (3) his interest in expressing the speech is not outweighed by the state's interests as an employer in promoting effective and efficient public service." *See Lett v. City of Chicago*, 946 F.3d 398, 400 (7th Cir. 2020) (cleaned up).

The motion to dismiss is about the latter two prongs of the test for protected speech by a public employee. Defendants argue that the complaint fails to allege that Moore spoke on a matter of public concern. Defendants also argue that Moore's interest in speaking was outweighed by the state's interests as an employer. *See* Defs.' Mem., at 5–6 (Dckt. No. 28).

The Court will address each argument, in turn.

The motion to dismiss is not about whether Moore enjoyed the right to free speech as a member of the public while inside the courtroom. *See, e.g.*, *Braun v. Baldwin*, 346 F.3d 761, 764 (7th Cir. 2003) ("Newspapers and the streets outside are open to scathing criticism of what happens within the courthouse. But the halls of justice may be kept hushed.") (quoting *Sefick v. Gardner*, 164 F.3d 370, 373 (7th Cir. 1998)); *Sefick*, 164 F.3d at 373 ("No one doubts that displays in courtrooms and adjacent corridors may be limited to the icons of government, such as

11

seals and flags, and that judges may insist that all those present behave in a dignified manner."); *Cox v. Louisiana*, 379 U.S. 559, 562 (1965) ("A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence.").

A courtroom is not a traditional venue for public expression by non-parties. Quite the opposite. By and large, the parties speak, and non-parties stay quiet. Speech by non-parties can undermine the platform for speech by the parties themselves, and detract from the ability of the judiciary to carry out its business. Non-parties, like children in the old English proverb, should be seen but not heard.

But the parties don't raise the issue – the parties don't speak about speech by non-parties – so this Court won't address it. Instead, this Court will address the arguments that are on the table, which don't carry a lot of weight.

## I. Matter of Public Concern

The first issue is whether Moore spoke about an issue of public concern. At this early stage, this Court cannot decide that question without a factual record. The complaint does enough to put the ball in play.

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). But if the "overall point" of the speech "was to express a purely personal grievance, then the First Amendment will not help" the speaker. *See Meade v. Moraine Valley Cmty. College*, 770 F.3d 680, 684 (7th Cir. 2014).

12

A court must determine "whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." *See Garcetti*, 547 U.S. at 418.

The "boundaries of the public concern test are not well defined." *See City of San Diego v. Roe*, 543 U.S. 77, 83 (2004); *see also Waters v. Churchill*, 511 U.S. 661, 692 (1994) (Scalia, J., concurring in the judgment) (noting that courts encounter "difficulties" when "determining whether speech pertains to a matter of public concern"); *Hernandez v. City of Phoenix*, 43 F.4th 966, 977 (9th Cir. 2022) ("What constitutes speech on a matter of public concern remains somewhat hazy, despite the decades that have passed since the concept was first employed."). Courts have painted the picture in broad strokes with a broad brush.

For starters, almost any fact can come into play when deciding whether the speech involves a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *See Connick v. Myers*, 461 U.S. 138, 147–48 (1983). But "content is the most important." *See Meade*, 770 F.3d at 684; *see also Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir. 2022) ("To determine whether speech involves a matter of public concern, we consider the content, form, and context of the statement, as revealed by the whole record. . . . [T]he pertinent question is not *why* the employee spoke, but *what* he said. That means we examine the *point* of the speech in question.") (emphasis in original) (cleaned up).

Typically, speech "is a matter of public concern if it relates to any matter of political, social, or other concern to the community." *See Gazarkiewicz v. Town of Kingsford Heights*,

359 F.3d 933, 940–41 (7th Cir. 2004) (cleaned up). If that definition feels like a tautology, you're not alone. Speech is a matter of public concern if it involves . . . something that is of concern to the public.

The idea is that a matter of public concern must sweep more broadly than a plaintiff's idiosyncratic interests. The speech must be of interest to the general public, not merely the speaker. If only Mom would care, it's not a matter of public concern.

A litmus test might be whether anyone else would listen up if the topic were featured on the nightly news. "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *See City of San Diego*, 543 U.S. at 83–84.

On the other hand, speech is not a matter of public concern when it "involves a personal grievance of interest only to the employee." *See Gazarkiewicz*, 359 F.3d at 941 (cleaned up). The weather is a matter of public concern. Your broken umbrella is not.

Here's another potential rule of thumb. Imagine if someone hopped on board a local CTA bus, and delivered the message to all of the passengers. If no one else on the bus would care, it's probably not a matter of public concern.

The speech does not have to involve a topic that is at the top of the mountain in the hierarchy of importance. *See Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1115–16 (7th Cir. 2013) ("Despite its lofty terminology, the matter of public concern inquiry does not require that speech relate to an issue of exceptional significance in order to be entitled to prima facie First Amendment protection. . . . [T]he speech need not address a topic of great societal importance, or even pique the interest of a large segment of the public, in order to be safeguarded by the First Amendment."); *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996)

("We explained that when the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of public concern, they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances – which whether or not protected by the First Amendment are too remote from its central concerns to justify judicial interference with the employment relation[.]") (cleaned up). The speech doesn't have to be "vital to the survival of Western civilization." *See Dishnow*, 77 F.3d at 197.

The question of First Amendment protection does not boil down to a nose-counting exercise. The speech doesn't have to appeal to everyone. *Id.* ("That the public was not large, that the issues were not of global significance . . . d[oes] not place [ ] speech outside the orbit of protection."). The point is that the speech needs to sweep more broadly, and involve a topic that is germane to the public generally. *See Craig*, 736 F.3d at 1117 ("That is precisely what public concern means – speech directed to the public need only address a 'matter[ ] in which the public might be interested' in order to be eligible for First Amendment protection.") (citation omitted).

Edgy speech can receive protection, too. *See Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern. Debate on public issues should be uninhibited, robust, and wide-open, and may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.") (cleaned up); *Craig*, 736 F.3d at 1116. Sometimes edgy speech is the best kind.

Defendants believe that the patch on Moore's vest flunks the test for a public concern. As they see it, any message involving the Sons of Anarchy did not involve a matter of public concern. *See* Defs.' Mem., at 5 (Dckt. No. 28).

Specifically, Defendants argue that the vest "did nothing to inform the public about any aspect of Cook County governmental operations or functions." *Id.* According to Defendants, Moore's fashion choice "was entirely related to" Moore's "own private, personal interests in influencing the direction and the outcome of a pending murder trial through visual intimidation and harassment." *Id.*

At this early stage, without any facts, this Court cannot declare that Moore's speech in the courtroom did not involve a matter of public concern. Maybe there was a message. Or maybe there was simply a scary-looking patch. It's hard to say in the abstract.

This Court does not know what, exactly, Moore was trying to communicate. And this Court might need to watch a lot more television to find out.

The context matters, too. *See Connick*, 461 U.S. at 147–48. And here, the speech took place in a public courtroom. It involved a high-profile case that received more than a little media attention. Maybe Moore was trying to communicate a message of some kind about the case. But whatever the message, he wasn't the only person interested in the subject.

Moore alleged that his speech involved the criminal prosecution of Officer Estrada's killers. The speech took place in a public courtroom during a public hearing about the death of a public servant. "[I]t would be difficult to find a matter of greater public concern than police protection and public safety." *See Swetlik v. Crawford*, 738 F.3d 818, 827 (7th Cir. 2013) (cleaned up); *see also Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002) ("In terms of content, this court has determined that police protection and public safety are generally a matter of public

concern."); *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993) ("Obviously, speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern.").

And in any event, the motion to dismiss overlooks the fact that the complaint alleges more than simply an edgy sleeveless vest. According to Moore, the Sheriff's Office retaliated against him for other forms of expression. Examples include "writing letters regarding his concerns about how the Estrada case was being both prosecuted and presided over," and "publicly discussing his concerns with the settlement offered with other police." *See* Cplt., at ¶ 57 (Dckt. No. 1).

Maybe the record will reveal that his speech was simply a "personal grievance." *See Gazarkiewicz*, 359 F.3d at 941. But at this early stage, Moore plausibly alleged that his speech involved a matter of public concern.

## II. Weighing Moore's Interests Against the County's Interests

Next, Defendants argue that the speech lacked constitutional protection because the balance of the interests tips in their favor. As they see it, Moore's interest in speaking was outweighed by the interests of the Cook County Sheriff's Department as his employer. Once again, from a procedural perspective, Defendants are getting ahead of themselves.

Under the so-called *Pickering* test, courts must engage in a balancing exercise that weighs the interests at stake. *See Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

17

Defendants believe that the see-saw tips in their favor. They argue that the "County's interest in preserving its reputation and inter-departmental cohesion – among its judiciary, prosecutors, and law enforcement officers – vastly outweighs" Moore's "purported interest in expressing his personal dissatisfaction with the direction of a criminal prosecution." *See* Defs.' Mem., at 9–10 (Dckt. No. 28).

Defendants ask this Court to dismiss Moore's complaint because Moore's speech "warranted discipline." *Id.* at 6. As Defendants see things, if Moore's behavior went unpunished, his "various actions, letters, and 'expressions' would disrupt the Sheriff's operations, degrade the Sheriff's reputation with the public (and the judiciary), and incite disharmony among the various employees and divisions of Cook County government." *Id.* at 10.

Defendants ask this Court to pick a winner on the weight of the evidence, without any evidence. It is difficult to weigh the facts, without any facts.

"*Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors." *See Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). But the Court does not have facts to consider. So, *Pickering* balancing is premature. *See Beathard v. Lyons*, 620 F. Supp. 3d 775, 783 (C.D. Ill. 2022) ("Because the parties have not yet had the opportunity to conduct discovery at this stage of the litigation, this Court cannot evaluate the facts under *Pickering* without engaging in speculation . . . . A *Pickering* test is improper at this time.").

At this early stage, based on the cold complaint alone, this Court cannot declare that the state's interests outweighed Moore's interests in speaking. This Court lacks details about what exactly happened. The parties need to gather the facts in discovery before this Court can weigh them on the scale.[3]

---

[3] As an aside, the written decision by the Merit Board adds a few additional details that might be important. Apparently, the judge (and not the prosecutor) made the decision that Moore could not wear

### III.    Waiver

Two final notes.

First, Defendants devoted one paragraph in their opening brief to the argument that the First Amendment does not cover FOIA requests.  *See* Defs.' Mem., at 6 (Dckt. No. 28).  Defendants cite one case from two decades ago.  *Id.* (citing *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998)).

The argument does not have any flesh on the bones.  It is too skeletal for the Court to consider at this stage.  *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that skeletal arguments may be properly treated as waived.") (cleaned up).

Second, Defendants unveiled a new argument in their reply brief, based on the content of the Merit Board's decision.  In their view, the Merit Board acted based on Moore's conduct, not his speech.  *See* Defs.' Reply, at 2–3 (Dckt. No. 37).  Defendants point to the Merit Board's finding that Moore "falsely portray[ed] himself as" Estrada's partner.  *Id.* at 3; *see also* Merit Board Decision (Dckt. No. 1, at 29 of 30).

As Defendants see things, the decision itself shows that Moore's conduct, not his speech, led to his termination.  Defendants believe that the decision is fair game on the motion to dismiss, because the complaint attached the decision as an exhibit.  Defendants argue that "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."  *See* Defs.' Reply, at 2 n.1 (Dckt. No. 37) (quoting *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013)).

---

the eye-catching attire in the jury box.  And the judge did not prohibit Moore from wearing the vest in the courtroom.  Instead, Moore "was told that if he continued to wear the vest then he would have to sit in the gallery."  *See* Merit Board Decision (Dckt. No. 1, at 27 of 30).  Those details may or may not be right.  But it does underscore the need to proceed with caution at this early stage.

Defendants did not raise that argument in their opening brief, so the Court will not consider it. The "failure to develop a legal argument in an opening brief results in the argument's waiver." *See Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 413 (N.D. Ill. 2021).

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is denied.


Date: January 31, 2024                                    _____

                                                          Steven C. Seeger
                                                          United States District Judge

20